# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 21-23494-CIV-ALTMAN

**ANA M. CARDONA**,

>  *Petitioner,*

*v.*

**RICKY D. DIXON, SECRETARY,**
**FLORIDA DEPARTMENT OF CORRECTIONS**,

>  *Respondent.*[1]

_____/

## ORDER

After three decades of trials, appeals, and collateral litigation in Florida's state courts, our Petitioner, Ana Cardona, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, attacking the constitutionality of the life sentence she's serving for murdering (and abusing) her three-year-old son. *See* Petition [ECF No. 1]. After careful review, we **DISMISS** Ground One of the Petition as procedurally defaulted and **DENY** the remaining grounds on their merits.

### THE FACTS

On November 2, 1990, the Miami Beach Police Department found "the battered body of an unidentified child . . . in the bushes of a Miami Beach residence." *Cardona v. State* (*Cardona I*), 641 So. 2d 361, 361 (Fla. 1994), *cert denied*, 513 U.S. 1160 (1995). The boy was initially identified in the media as "Baby Lollipops"—a reference to the clothing he was wearing when he was discovered. *See Cardona v. State* (*Cardona III*), 185 So. 3d 514, 517 (Fla. 2016) ("His t-shirt bearing a lollipop design would

---

[1] The original Respondent in this case, Mark Inch, retired from his position as Secretary of the Florida Department of Corrections on November 19, 2021. Former Secretary Inch's successor, Ricky D. Dixon, has been automatically substituted as the Respondent. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

inspire the Miami Beach Police Department to dub the investigation to uncover the identity of the boy and the person responsible for the boy's death as the 'Baby Lollipops' case."). Once law enforcement determined that "Baby Lollipops" was L.F., the three-year-old son of Ana Cardona, Cardona was "arrested and charged with aggravated child abuse and first-degree murder." *Cardona I*, 641 So. 2d at 362; *see also* Indictment [ECF No. 16-3] at 91–92.

According to the evidence presented at her first trial, Cardona had been living with L.F.'s father, "a well-off drug dealer named Fidel Figueroa," until Fidel was murdered one month before L.F. was born. *Cardona I*, 641 So. 2d at 362. Cardona exhausted Fidel's substantial estate in a matter of months and, for a brief stint, "[L.F.] and his sister were [ ] turned over to the Department of Health and Rehabilitative Services." *Ibid.* According to the Department's medical records, "when [L.F.] was eleven months old, he was healthy and weighed about twenty pounds." *Ibid.* After the children were returned to Cardona, she became "romantically involved" with another woman—her codefendant, Olivia Gonzalez-Mendoza ("Gonzalez"). *Ibid.* As the Florida Supreme Court explained, L.F.'s life took a sharp turn for the worse once Cardona and Gonzalez began living together:

> Cardona and her children lived with Gonzalez-Mendoza in a series of cheap hotels. Gonzalez-Mendoza's various jobs and shoplifting were the women's only sources of income. During an eighteen-month period that began after the children were returned to her, Cardona beat, choked, starved, confined, emotionally abused and systematically tortured [L.F.]. The child spent much of the time tied to a bed, left in a bathtub with the hot or cold water running, or locked in a closet. To avoid changing [L.F.]'s diaper for as long as possible, Cardona would wrap duct tape around the child's diaper to hold in the excrement. Cardona blamed [L.F.] for her descent "from riches to rags," and referred to him as "bad birth."
>
> Gonzalez-Mendoza was aware of the abuse and began to participate in the abuse because it pleased Cardona. According to Gonzalez-Mendoza, on the last day of October 1990, Cardona severely beat [L.F.] with a baseball bat. After splitting the child's head open, Cardona locked the little boy in the closet where he had been confined for the last two months. The next day, Gonzalez-Mendoza opened the closet door and attempted to quiet [L.F.] by frightening him with the bat. When [L.F.] began to scream at the sight of his mother, Cardona grabbed the bat from Gonzalez-Mendoza. Gonzalez-Mendoza then left the room. When she returned, Cardona told her that Cardona believed she had killed [L.F.]. After dressing the child, the two

women took [L.F.] to a Miami Beach residence and abandoned him in some bushes, where he was later found.

*Ibid.*

The State also relied on the testimony of the medical examiner, who testified that "[L.F.] did not die from one particular injury; rather, he died from months of child abuse and neglect." *Ibid.* The medical examiner explained that L.F. "was emaciated," that he "weigh[ed] only eighteen pounds," that he had "numerous and extensive physical injuries," and that most of those injuries, some of which were "up to a year old," "would have caused prolonged excruciating pain." *Ibid.* Although the medical examiner identified the trauma L.F. received from the baseball bat as the "fatal blow," he also concluded that "[L.F.] was already dying from his other injuries at the time the final blow was inflicted." *Id.* at 363.

A Florida jury found Cardona guilty of both counts and "recommended death by a vote of eight to four." *Ibid.*; *see also* First Trial Verdict [ECF No. 16-3] at 184–86. The trial court agreed with the jury's recommendation, finding that "the murder was especially heinous, atrocious, or cruel" and that Cardona's mitigation evidence didn't outweigh the "overwhelming and enormous weight" of the aggravating circumstances. *Cardona I*, 641 So. 2d at 363. The Florida Supreme Court[2] unanimously affirmed Cardona's conviction, having determined that "the death penalty is warranted[.]" *Id.* at 366.

After her conviction was affirmed, Cardona sought postconviction relief in state court pursuant to Rules 3.850 and 3.851 of the Florida Rules of Criminal Procedure. In her operative "Amended Motion to Vacate Judgments of Conviction and Sentence," Cardona advanced thirteen grounds for relief, only one of which is relevant here: Cardona's allegation that the State "withheld

---

[2] Under Florida's Constitution, the Florida Supreme Court has *exclusive* appellate jurisdiction over any case in which the trial court has imposed a death sentence. *See* FLA. CONST., art. V, § 3(b)(1) ("The supreme court shall hear appeals from final judgments of trial courts imposing the death penalty[.]"); *State v. Fourth Dist. Ct. of App.*, 697 So. 2d 70, 71 (Fla. 1997) ("In order to clarify our position, we now hold that in addition to our appellate jurisdiction over sentences of death, we have exclusive jurisdiction to review all types of collateral proceedings in death penalty cases.").

evidence that was material and exculpatory in nature and/or presented false and/or misleading evidence," in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Amended Motion to Vacate [ECF No. 16-6] at 58. In that claim, Cardona alleged that the State had purposely withheld the contents of a "written proffer made by Gonzalez to the State," which (she claimed) contained material and exculpatory information. *Id.* at 61. According to Cardona, Gonzalez told the prosecutors that Cardona was "in a crazed state of hysteria and perhaps under the influence of drugs" when she killed [L.F.], and that Cardona had "attempted to revive the baby" after he'd been knocked unconscious. *Id.* at 61–62. Cardona also claimed that Gonzalez's statements during that proffer differed substantially from her later trial testimony and that, as a result, these inconsistent earlier statements could have "provided fertile impeachment of [Gonzalez's] trial testimony." *Id.* at 63.

The state postconviction court denied Cardona's *Brady* claim, finding that "[t]here was no reasonable probability that any omitted evidence would have changed the conclusion of [the] jury," even if the proffered testimony "would have assisted defense counsel in impeaching Olivia Gonzalez-Mendoza[.]" Order Denying Amended Motion to Vacate [ECF No. 16-6] at 220. Cardona appealed this denial to the Florida Supreme Court, which reversed the lower court and remanded the case for a new trial. *See Cardona v. State* (*Cardona II*), 826 So. 2d 968, 982 (Fla. 2002). In the Florida Supreme Court's view, Cardona's lawyers should have been permitted to use these prior inconsistent statements to impeach Gonzalez about her "description of the events of the day before [L.F.] died," "the description of the events on the day [L.F.] died," "the details of the abuse described," and "the date when Gonzalez last abused [L.F.]." *Id.* at 974. According to the Florida Supreme Court, the prior statements "could reasonably have been taken to put the whole case in such a different light as to undermine confidence in the verdict." *Ibid.* (quoting *Way v. State*, 760 So. 2d 903, 913 (Fla. 2000)).

Cardona's retrial began in 2010. This time, to avoid the *Brady* problems the Florida Supreme Court had been concerned with, "the State did not introduce the testimony of Gonzalez but instead

relied primarily on circumstantial evidence to establish Cardona's guilt." *Cardona III*, 185 So. 3d at 517. As before, the State introduced compelling medical evidence, which showed that L.F. had been the victim of systemic and extreme child abuse—and that he had died from years of neglect. *See id.* at 518 ("In the opinion of the medical examiner, the cause of death was 'child abuse syndrome,' resulting from the cumulative effect of all of [L.F.]'s injuries, even though the injuries to the corpus callosum hastened his death."). Having heard all the evidence, this second jury likewise found Cardona guilty of first-degree murder and aggravated child abuse and again recommended a sentence of death. As in the first trial, the state trial court agreed and sentenced Cardona to death. *See* Second Trial Verdict and Judgment [ECF No. 16-12] at 1–7.

Cardona appealed her second conviction and sentence to the Florida Supreme Court, which *again* "vacate[d] Cardona's convictions and death sentence and remand[ed] for a new trial." *Cardona III*, 185 So. 3d at 527. This time, the Florida Supreme Court found that Cardona's right to a fair trial had been violated by the State's "inflammatory" and "egregious" closing argument. *See id.* at 520 ("Closing argument 'must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant.'" (quoting *Bertolotti v. State*, 476 So. 2d 130, 134 (Fla. 1985))). In the high court's view, the State's repeated use of the phrase "justice for [L.F.]"—together with the prosecutor's admonition that a guilty verdict was the "only verdict" that would provide justice to L.F.—had "unquestionably crossed the line." *Id.* at 522.

So, Cardona proceeded to trial for a third time. This time, though, the State didn't pursue the death penalty. *See* Amended Indictment [ECF No. 16-14] at 1–2. To combat the medical evidence that had been introduced in her first two trials, Cardona testified that L.F. "was not in her care in the weeks and months that preceded his death" and that "her girlfriend had taken L.F. to live with a wealthy friend in Miami Beach and that the girlfriend had prohibited her from seeing him again prior to his death." *Cardona v. State* (*Cardona IV*), 299 So. 3d 1142, 1144 (Fla. 3d DCA 2020). Despite this self-

serving testimony, on December 13, 2017, a third jury found Cardona guilty of first-degree murder and aggravated child abuse. *See* Third Trial Verdict [ECF No. 16-14] at 59–60. The trial court imposed a life sentence on the murder charge—with a twenty-five-year mandatory minimum—and a consecutive term of fifteen years for the aggravated child abuse. *See* Third Trial Judgment and Sentencing Orders [ECF No. 16-14] at 61–67.

Cardona appealed her conviction and sentence to Florida's Third DCA and raised only one issue: that the trial court had erred in allowing the medical examiner to testify that "the cause of L.F.'s death was[ ] 'child abuse syndrome[.]'" Direct Appeal Initial Brief [ECF No. 16-15] at 25 (cleaned up). On January 15, 2020, the Third DCA affirmed the state trial court in a written opinion, holding that the medical examiner had properly opined on the cause of L.F.'s death because that evidence was "highly probative" given the State's position that the death *wasn't* accidental. *Cardona IV*, 299 So. 3d at 1146 (citing *Estelle v. McGuire*, 502 U.S. 62, 69 (1991)). The Third DCA also rejected Cardona's principal contention on appeal, which was that, because she hadn't presented an accidental-death defense, the medical examiner's opinion was irrelevant and (thus) prejudicial. *See id.* at 1147 ("The battered child syndrome evidence was relevant and admissible to prove both intent and lack of accident, which is precisely what the State used it for. It is irrelevant that Cardona chose a trial strategy other than accidental death."). Cardona appealed the Third DCA's decision to the Florida Supreme Court, which dismissed her appeal as untimely on March 13, 2020. *See Cardona v. State*, 2020 WL 1242952, at *1 (Fla. Mar. 13, 2020).

Now proceeding *pro se*, on January 20, 2021, Cardona filed a state motion for postconviction relief under FLA. R. CRIM. P. 3.850.[3] *See* Postconviction Motion [ECF No. 16-16] at 1–17. In that

---

[3] "Under the 'prison mailbox rule,' a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009). "Absent evidence to the contrary, [courts] assume that a prisoner delivered a filing to prison authorities on the date that he signed it." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014).

Postconviction Motion, Cardona raised five[4] grounds for relief: (1) that counsel was ineffective for failing to subpoena Gonzalez to testify at trial, *id.* at 4–5; (2) that counsel was ineffective for failing to "actively attempt[ ] to secure" the testimony of Gonzalez, *id.* at 6; (3) that counsel was ineffective "for failing to file a motion for change of venue," *id.* at 7; (4) that counsel was ineffective "for failing to excuse multiple jurors" who "admitted that they had previously heard about the case," *id.* at 8; and (5) that "the cumulative effect of [counsel's] errors denied defendant [a] fair and impartial trial," *id.* at 14. On June 4, 2021, the state postconviction court denied all of Cardona's claims in a comprehensive written order. *See* Order Denying Postconviction Motion [ECF No. 16-16] at 44–53.

Cardona appealed the denial of her Postconviction Motion to the Third DCA. *See* Postconviction Initial Brief [ECF No. 16-16] at 60 ("The Appellant asserts that the trial court erred in denying her Motion for Post Conviction. . . . Defendant is requesting that this Honorable Court reverse and remand the trial court's denial of these claims."). The Third DCA summarily affirmed the state postconviction court in an unwritten opinion, *see Cardona v. State* (*Cardona V*), 323 So. 3d 728, 728 (Fla. 3d DCA 2021), and its mandate issued on September 24, 2021, *see* Postconviction Mandate [ECF No. 16-16] at 72. Cardona tried to appeal the Third DCA's decision to the Florida Supreme Court—but, on September 23, 2021, the high court held that it "lacks jurisdiction to review an unelaborated decision from a district court of appeal" and dismissed the appeal. *See Cardona v. State*, 2021 WL 4344047, at *1 (Fla. Sept. 23, 2021).

Cardona filed her § 2254 Petition in the U.S. District Court for the Northern District of Florida on September 20, 2021. *See* Petition at 1. The Northern District of Florida then transferred the case to us on September 30, 2021. *See* Order to Transfer [ECF No. 3]. The Respondent concedes that the Petition is timely under 28 U.S.C. § 2244(d). *See* Response to Order to Show Cause ("Response")

---

[4] In her Postconviction Motion, Cardona listed ten grounds for relief, but Grounds Four through Nine merely provided details about the five jurors she wanted the state judge to excuse for cause. *See generally* Postconviction Motion [ECF No. 16-16] at 8–14.

[ECF No. 15] at 50 ("The current federal petition was filed . . . within the one-year limitations period."). This Order follows.

THE LAW

## I.      The Antiterrorism and Effective Death Penalty Act ("AEDPA")

AEDPA instructs district courts to deny any claim that was "adjudicated on the merits" in a state-court proceeding unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (summarizing 28 U.S.C. § 2254(d)–(e)). To have "adjudicated [the claim] on the merits," the state court need not have issued any kind of formal opinion or even outlined its reasoning. *Id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Rather, when a state court doesn't articulate its reasons for the denial, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To be "contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (cleaned up).

For "a state court's application of [Supreme Court] precedent" to be "'unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (cleaned up). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Richter*, 562 U.S. at 101. "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up).

Section 2254(d) similarly prohibits federal judges from reevaluating a state court's factual findings unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To establish that a state court's factual findings were unreasonable, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)). "[E]ven if a petitioner successfully carries his burden under § 2254(e)(1)—showing by clear and convincing evidence that a particular state-court factual determination was wrong—he does not necessarily meet his burden under § 2254(d)(2): Even if the state court made a clearly erroneous factual determination, that doesn't necessarily mean the state court's 'decision' was 'based on' an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc) (quoting 28 U.S.C. § 2254(d)(2)). Indeed, habeas relief is not warranted "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as

a whole, doesn't constitute an unreasonable determination of the facts and isn't based on any such determination." *Ibid.* (cleaned up).

"AEDPA's standard is intentionally difficult to meet." *Woods*, 575 U.S. at 315 (cleaned up). When reviewing state criminal convictions on collateral review, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 316 (cleaned up).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The *Brecht* harmless-error standard requires habeas petitioners to prove that they suffered "actual prejudice." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012). As the Supreme Court recently explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht*'s actual-prejudice requirement. *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022). In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether or not' AEDPA applies." (citing *Fry v. Pliler*, 551 U.S. 112, 121 (2007)). In short, a "federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests." *Id.* at 1524; *see also Mansfield*, 679 F.3d at 1307 ("[A] habeas petition cannot be successful unless it satisfies both [AEDPA] and *Brecht*.").

## II.    AEDPA's Procedural Requirements

"[A] person in custody pursuant to the judgment of a State court" has one year to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). That one-year period "runs from the latest of" the following dates:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D). But this limitations defense is waivable. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 655 (11th Cir. 2020) (explaining that the State may express its intent to "waive the limitations bar").

Beyond meeting this one-year window, though, federal habeas petitioners must also *exhaust* their claims by "*properly* present[ing] [them] to the state courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). Specifically, federal habeas petitioners must "fairly present every issue raised in [their] federal petition to the state's highest court, either on direct appeal or on collateral review." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (cleaned up). "If a petitioner fail[ed] to 'properly' present his claim to the state court—by exhausting his claim[ ] and complying with the applicable state procedure— prior to bringing his federal habeas claim, then [§ 2254] typically bars [courts] from reviewing the claim." *Ibid.* In other words, where a petitioner has not "*properly* presented his claims to the state courts," the petitioner will have "procedurally defaulted his claims" in federal court. *O'Sullivan*, 526 U.S. at 848.

There are, to be sure, two exceptions to the general rule that a federal court may not consider a procedurally defaulted claim on the merits: "cause and prejudice" and "actual innocence." *Dretke v. Haley*, 541 U.S. 386, 393 (2004) ("[A] federal court will not entertain a procedurally defaulted

constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default. We have recognized a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense."). A habeas petitioner can establish "cause and prejudice" if (1) "some objective factor external to the defense impeded the effort to raise the claim properly in the state court," and (2) "there is at least a reasonable probability that the result of the proceeding would have been different." *Harris v. Comm'r, Ala. Dep't of Corr.*, 874 F.3d 682, 688 (11th Cir. 2017). "Actual innocence," on the other hand, "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted the petitioner.'" *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). The petitioner bears the burden of establishing that one of these exceptions to the procedural-default rule applies. *See Gordon v. Nagle*, 2 F.3d 385, 388 (11th Cir. 1993) ("A defendant has the burden of establishing cause and prejudice."); *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006) ("The petitioner must support the actual innocence claim with new reliable evidence[.]" (cleaned up)).

All that said, "[s]tates can waive procedural bar defenses in federal habeas proceedings, including exhaustion." *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir. 2016) (cleaned up)). But "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement." 28 U.S.C. § 2254(b)(3) (emphasis added); *see also McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005) (same).

## III.    Ineffective Assistance of Counsel

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S.

668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate "that (1) his counsel's performance was deficient and 'fell below an objective standard of reasonableness,' and (2) the deficient performance prejudiced his defense." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88). This same standard applies to alleged errors made by both trial counsel and appellate counsel. *See Farina v. Sec'y, Fla. Dep't of Corr.*, 536 F. App'x 966, 979 (11th Cir. 2013) ("A claim of ineffective assistance of appellate counsel is evaluated under the same standard as for trial counsel.").

To establish the first prong (deficiency), "a petitioner must [show] that *no* competent counsel would have taken the action that his counsel did take[.]" *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (emphasis added). So, if "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial[,]" counsel could not have performed deficiently. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).

As for the second prong (prejudice), "a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To succeed on this prong, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

## ANALYSIS

Cardona's Petition advances five grounds for relief. In Ground One, Cardona alleges that the trial court violated her right to due process when it allowed the medical examiner, Dr. Hyma, to testify "at the petitioner's trial stating [sic] that 'child abuse syndrome' caused the death of the victim."

Petition at 6. In Ground Two, Cardona avers that her trial counsel was ineffective for failing to subpoena Olivia Gonzalez for the purpose of impeaching her at trial with "several contradictory statements regarding the events that took place on the day the victim received the blow to the head that caused his death." *Id.* at 9. In Ground Three, Cardona blames her attorney for failing to "secure, in a timely manner," the testimony of Olivia Gonzalez. *Id.* at 11–12. Cardona castigates her lawyer in Ground Four for ignoring her request to move for "a change of venue because she felt that she would not receive a fair trial in Dade County, Florida." *Id.* at 14. Finally, in Ground Five, she contends that counsel was ineffective for failing to strike "five potential jurors [who] had admitted that they had previously heard about the case from the original onset of the crime." *Id.* at 17.

But we cannot consider any claim on the merits unless Cardona "has exhausted the remedies available in the courts of the State" or unless "the State, through counsel, expressly waives the requirement." 28 U.S.C. §§ 2254(b)(1)(A), (b)(3). If the State's response is silent or ambiguous on exhaustion, "the court [is] required to address and decide whether petitioner had exhausted his state remedies." *Dill v. Holt*, 371 F.3d 1301, 1302 n.1 (11th Cir. 2004); *see also, e.g.*, *Burgess v. Dixon*, 2022 WL 16948959, at \*6 & n.5 (S.D. Fla. Nov. 15, 2022) (Altman, J.) ("Although the Respondent can 'expressly waive' [the exhaustion] requirement, the Response is silent on this issue."). In our case, the Respondent argues that Ground One of Cardona's Petition *hasn't* been exhausted. *See* Response at 55 ("[T]he current federal constitutional claim has not been fully exhausted in state court and cannot be presented for the first time in a federal habeas corpus proceeding."). But, since it never mentions exhaustion with respect to the *other* four claims, we'll have to independently determine whether Cardona has exhausted them too.

Fortunately, these latter four claims are easy. All four allege that Cardona's trial lawyer rendered ineffective assistance of counsel. *See* Petition at 9–17. Under Florida law, an ineffective-assistance-of-counsel claim must "be raised on collateral review pursuant to Florida Rule of Criminal

Procedure 3.850." *Sullivan v. Sec'y, Fla. Dep't of Corr.*, 837 F.3d 1195, 1199 (11th Cir. 2016). To exhaust a claim that can be raised for the first time in a Rule 3.850 motion, the habeas petitioner must "not only [file] a FLA. R. CRIM. P. 3.850 motion, but [also] appeal from its denial." *Nieves v. Sec'y, Fla. Dep't of Corr.*, 770 F. App'x 520, 521 (11th Cir. 2019) (quoting *Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979)). And Cardona has done that. She first raised the federal nature of these claims in a Rule 3.850 postconviction motion, *see* Postconviction Motion [ECF No. 16-16] at 4–14, and she then appealed denial of those same claims to the Third DCA, *see* Postconviction Initial Brief [ECF No. 16-16] at 60–68. Since Cardona "fairly presented" Grounds Two through Five "to the state's highest court, either on direct appeal or on collateral review," *Mason*, 605 F.3d at 1119, we find that these grounds have been exhausted. With that out of the way, we'll take each of Cardona's claims in turn.

### A.      Ground One

Cardona alleges in Ground One that the trial court violated her Fourteenth Amendment right to due process when it allowed the medical examiner, Dr. Hyma, to testify that "child abuse syndrome caused the death of the victim." Petition at 6.[5] Cardona believes that this kind of testimony should only be used "to rebut the suggestion that a child's injuries are the result of [an] accident rather than abuse." *Id.* at 7. And Cardona never alleged that L.F.'s death was an accident; instead, she argued at trial that "the victim was no [longer] in the petitioner's custody during the last months of his life." *Ibid.* By allowing Dr. Hyma to testify about child abuse syndrome in these circumstances, Cardona says, the trial court confused the jury and undermined her defense. *See ibid.* ("Dr. Hyma testified that child abuse syndrome was the sole cause of death. This confused the issues and negated the petitioner's defense at trial.").

---

[5] Because Dr. Bruce Hyma died before Cardona's third trial, the trial court allowed the State to read Dr. Hyma's testimony from Cardona's earlier trial into the record. *See* Trial Tr. Vol. 10 [ECF No. 14-10] at 72–73 ("[Prosecutor:] The State at this point will call in Dr. Hyma's testimony for read back. . . . The Court: Okay. Same rulings as before. It will come in.").

The Respondent disagrees and advances two arguments. *First*, it says that Ground One is unexhausted because "the claim as asserted in state court was argued solely as a matter of admissibility under state rules of evidence regarding relevancy and prejudice[.]" Response at 54–55. *Second*, it maintains that Dr. Hyma's testimony "was relevant and [its] prejudice did not exceed its probative value; and the admission of the testimony did not result in a due process violation." *Id.* at 55. We agree with the Respondent on both counts.

We start, again, with exhaustion. As we've said, the Respondent contends that Ground One "has not been fully exhausted in state court and cannot be presented for the first time in a federal habeas proceeding." *Ibid.* As the Respondent sees things, although Cardona *currently* "couche[s] [Ground One] in terms of a federal constitutional issue," she *never* "refer[red] to due process of law as a basis for these arguments" in state court and instead relied *solely* on "state evidentiary claims of relevancy and whether any relevancy was outweighed by prejudice or confusion, under [Fla. Stat. §§ 90.402–.403]." *Id.* at 62–63. In her Reply, Cardona counters that she sufficiently "present[ed] the substance of her claim to the state courts." Reply to State's Response ("Reply") [ECF No. 21] at 9.

To properly exhaust a claim, a habeas petitioner must "fairly present" the federal claim in state court before raising it in his federal habeas petition. *See McNair*, 416 F.3d at 1302 ("In order to be exhausted, a federal claim must be fairly presented to the state courts." (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971))). Exhaustion doesn't require the petitioner to make "a verbatim restatement of the claims brought in state court," but it does require "that a petitioner present[ ] his claims to the state court 'such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation.'" *Ibid.* (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)).

Cardona first tried to limit Dr. Hyma's testimony in a pre-trial motion in limine, where she asked the court to preclude the medical examiner's opinion that L.F. had died from "child abuse

syndrome." Motion in Limine [ECF No. 16-14] at 28–29. In that motion, Cardona agreed that L.F.'s injuries weren't accidental, but she told the court that she planned to blame the death on Olivia Gonzalez. *See ibid.* ("Nor is the defense contending that the head injuries were accidental. To the contrary, the defense contends that those injuries were intentionally inflicted, by Olivia Gonzalez."). Cardona's counsel also submitted a "Supplemental Memorandum of Law" in support of the motion in limine, citing various state and federal cases, including *Estelle v. McGuire*, 502 U.S. 62 (1991), for the proposition that "the use of the term 'child abuse syndrome' will inflame the jury, is extremely prejudicial and is not probative of any material fact[.]" Supplemental Memorandum of Law in Support of Motion in Limine [ECF No. 16-14] at 39–40 (citing FLA. STAT. § 90.403). The state trial court denied the motion in limine, concluding that Dr. Hyma's testimony about child abuse syndrome "is relevant to prove intent" and that "the evidence of abuse . . . is not substantially outweighed by the risk of unfair prejudice, confusion, or misleading the jury." Order Denying Motion in Limine [ECF No. 16-14] at 45–46.

Cardona's *sole* argument on direct appeal was that the "court erred in permitting testimony that child abuse syndrome *caused* the death of [L.F.]." Direct Appeal Initial Brief [ECF No. 16-15] at 25. As trial counsel had done, Cardona's appellate counsel cited several state and federal cases—including *McGuire*—for the proposition that "[c]hild abuse syndrome testimony is generally admitted for one purpose: To rebut the suggestion that a child's injuries are the result of accident rather than abuse." *Id.* at 28. And Cardona made clear her view that Dr. Hyma's testimony was inadmissible under Florida's evidentiary rules. *See id.* at 33 ("Evidence is inadmissible, [sic] 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.' . . . Here the testimony that child abuse syndrome was the sole cause of death confused the issues surrounding the intervening cause for [L.F.]'s death and mislead [sic] the jury to reject Ms. Cardona's defense." (quoting FLA. STAT. § 90.403)).

At no point, however, did Cardona argue that Dr. Hyma's testimony violated her right to due process under the U.S. Constitution. *See generally id.* at 25–33. She, in fact, never mentioned the Due Process Clause or the Constitution at all. And, while she did cite some federal cases in her brief, she *never* used those citations "to establish any due process or constitutional underpinning to the claim. Rather, the defense was trying to use *McGuire* to support its limited theory of relevancy." Response at 63; *see also Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."); *Hartge v. McDonough*, 210 F. App'x 940, 943 (11th Cir. 2006) (rejecting the petitioner's position that "his arguments [in state court], that the photograph was inflammatory and prejudicial and that the trial court erred in not applying the § 90.403 balancing test, were sufficient to [exhaust] his due process claim"). Since a "reasonable reader" *wouldn't* have interpreted Cardona's state-court arguments as advancing *any* federal constitutional claim, Ground One is unexhausted. *See Kelley*, 377 F.3d at 1344–45.[6]

All that said, even if Cardona had exhausted Ground One, that claim would still fail on the merits. Cardona alleges that, by allowing Dr. Hyma to opine that child abuse syndrome was the cause of L.F.'s death, the trial court violated her due-process rights. *See* Petition at 7 ("Dr. Hyma testified that the child abuse syndrome was the sole cause of death. This confused the issues and negated the petitioner's defense at trial. The petitioner's defense at trial was that the victim was no[t] in the petitioner's custody during the last months of his life. . . . [Dr. Hyma's] testimony basically stated that

---

[6] Cardona doesn't suggest that she can overcome this procedural default through the well-settled exceptions for "cause and prejudice" or "actual innocence." *See generally* Petition; Reply. Since she's thus waived her right to rely on these equitable exceptions, we needn't address them further. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Burgos v. Dixon*, 2022 WL 17093216, at *11 (S.D. Fla. Nov. 21, 2022) (Altman, J.) ("But, for either exception to apply, the petitioner bears the burden of proof. Burgos doesn't even try to suggest that these exceptions might save his claims here[,] so he's forfeited any argument that they do[.]" (cleaned up)).

it would not matter if there was an intervening cause remote from the petitioner's involvement."). But

the Third DCA already considered this same argument and roundly rejected it. In that court's view:

> Florida law permits medical examiners to testify regarding the victim's cause of death. In fact, a medical examiner may even render a cause of death opinion that was reached by process of elimination of other possible causes. It is inapposite that the medical examiner's testimony contradicts the defense theory of the case.
>
> In this case, it was not an abuse of discretion for the trial court to permit Dr. Hyma to testify that battered child syndrome caused L.F.'s death. "By eliminating the possibility of accident, the evidence regarding battered child syndrome was clearly probative of that essential element, especially in light of the fact that [Cardona] had claimed prior to trial that [L.F.] had injured [him]self by falling from the [bed]." *McGuire*, 502 U.S. at 69. Despite Cardona's claims on appeal, Dr. Hyma did not opine that the *sole* cause of death was battered child syndrome. In fact, he conceded that either the syndrome or the blunt force injury would have alone been sufficient to cause L.F.'s death. He testified that it was his opinion that the cause of death was battered child syndrome, which Florida law permits. This opinion was within his expertise and was based on his autopsy of L.F.'s body.
>
> [. . . .]
>
> The battered child syndrome evidence was relevant and admissible to prove both intent and lack of accident, which is precisely what the State used it for. It is irrelevant that Cardona chose a trial strategy other than accidental death. As in *McGuire* and other cases, because of the charges against Cardona, the State was "required to prove that [L.F.'s] death was caused by the defendant's *intentional act*." 502 U.S. at 69 (emphasis added). "Proof of [L.F.'s] battered child status helped to do just that; although not linked by any direct evidence to [Cardona], the evidence demonstrated that [L.F.'s] death was the result of an *intentional act* by *someone*, and not an accident." *Id.* at 69.

*Cardona IV*, 299 So. 3d at 1146–47 (emphasis in original & cleaned up).

The Third DCA got it exactly right. In *McGuire*, the Supreme Court held that expert testimony

about battered child syndrome—which implied that the child's "prior injuries" could have been caused

by the defendant—didn't render the trial "arbitrary and fundamentally unfair in violation of due

process." 502 U.S. at 67 (cleaned up). In the Court's view, this evidence was highly relevant because

the state used it to prove "that certain injuries are a product of child abuse, rather than accident," and

it wasn't unduly prejudicial because the expert never opined on "the identity of the person who might

have inflicted those injuries." *Id.* at 68. The *McGuire* Court came to this conclusion even though "no

claim was made at trial that [the child] died accidentally"—an irrelevancy, the Court said, since the state still had the burden "to demonstrate that the killing was intentional." *Id.* at 69. "The evidence of battered child syndrome," the Court added, "was relevant to show intent, and nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point." *Id.* at 70; *see also id.* at 75–76 (O'Connor, J., concurring in part and dissenting in part) ("I agree with the Court that the evidence of battered child syndrome was relevant. The State had to prove that Mark McGuire intended to kill his daughter, and the evidence that Tori was a battered child was probative of causation and intent."); *accord Heath v. Roberts*, 2004 WL 2496698, at *8 (D. Kan. Nov. 5, 2004) (Marten, J.) ("Even though the defendant had not raised the argument that the death was accidental, . . . the prosecution was free to prove the essential elements of an offense as it deemed appropriate. Since the [battered child syndrome] evidence was probative, the Supreme Court held that there was no violation of due process rights with the admission of this evidence."), *certificate of appealability denied*, 2005 WL 1519105, at *1 (10th Cir. June 28, 2005).

Given *McGuire*'s unambiguous holding, the state trial court in our case *didn't* violate Cardona's due-process rights—whether or not she argued that L.F.'s death was accidental—by admitting Dr. Hyma's testimony that the child died of "child abuse syndrome." As in *McGuire*, after all, the State in our case bore the burden of proving that Cardona *intentionally* killed L.F. *See* FLA. STAT. § 782.04(1)(a) (defining first-degree murder as "the unlawful killing of a human being when perpetrated from a premeditated design to effect the death of the person killed or any human being."). Dr. Hyma's medical opinion confirmed that L.F.'s death wasn't an accident and that *someone* (though not necessarily Cardona) had intentionally killed him. *See Cardona IV*, 299 So. 3d at 1147 ("Dr. Hyma's opinion, which was based on his training and experience, assisted the jury in understanding the evidence, and he did not testify to conclusions that the jury was qualified to make or to the ultimate question for the jury's

determination—whether Cardona was guilty of the crimes for which she was charged." (cleaned up)); *see also McGuire*, 502 U.S. at 69 ("[T]he evidence demonstrated that Tori's death was the result of an intentional act by *someone*, and not an accident."). This left plenty of room for the parties to argue about *who* was responsible for L.F.'s death. *See Cardona IV*, 299 So. 3d at 1146–47 ("Moreover, Dr. Hyma's testimony did not invade the province of the jury as it did not provide a conclusion as to the ultimate issue to be decided by the jury."). The Third DCA thus reasonably applied federal law when it rejected (on appeal) the due-process claim Cardona now repackages in Ground One.

Ground One, in short, is **DISMISSED** as procedurally defaulted. As we've explained, however, even if this claim *had been* exhausted, we would have **DENIED** it on the merits.

### B. Grounds Two and Three

We'll handle Grounds Two and Three together because they raise (essentially) identical claims. In Ground Two, remember, Cardona contends that her trial counsel was ineffective for failing to subpoena "Olivia Gonzalez, who made several contradictory statements regarding the events that took place on the day the victim received the blow to the head that caused his death." Petition at 9. And, in Ground Three, she says that her lawyer was ineffective for "wait[ing] until two weeks prior to trial to attempt to contact Gonzalez." *Id.* at 11. In both grounds, then, Cardona insists that, had Gonzalez testified at trial, the jury would have found that *Gonzalez* killed L.F. because she (Gonzalez) had "admitted to using a baseball bat to strike the victim." *Id.* at 10.

Cardona did advance Grounds Two and Three in her appeal of the denial of her Postconviction Motion, *see* Postconviction Initial Brief [ECF No. 16-16] at 60–63, and the Third DCA summarily rejected both claims, *see Cardona V*, 323 So. 3d at 728. But, since the appellate court issued no opinion, we must "look through" the Third DCA's order and assess the reasonableness of the "last related state-court decision that does provide a relevant rationale," *Wilson*, 138 S. Ct. at 1192—which,

in this case, is the state postconviction court's Order Denying Postconviction Motion [ECF No. 16-16] at 44–53.

In its thorough order, the state postconviction court wisely reconstrued Grounds Two and Three as one claim, through which (as the court explained) Cardona was calling her lawyer "ineffective for failing to secure Olivia Gonzalez's presence as a witness." *Id.* at 48. The state postconviction court concluded that Cardona's argument was "meritless" for two reasons. *Ibid. First*, the court found that Gonzalez "was unavailable as a witness," so counsel *couldn't* have been ineffective "for not securing a witness that was unavailable[.]" *Id.* at 48–49 (citing *Nelson v. State*, 875 So. 2d 579, 583 (Fla. 2004)). *Second*, the court pointed out that Cardona's counsel "was allowed to call two witnesses to testify to statements allegedly made by Ms. Gonzalez in prison admitting she hit [L.F.] with a baseball bat," which ultimately "relieved Cardona of the need to call Ms. Gonzalez as a witness." *Id.* at 48. Unsurprisingly, the Respondent adopts the state postconviction court's reasoning and urges us to do the same. *See* Response at 98 ("It cannot be said that the state court's determination is contrary to clearly established federal law or an unreasonable application thereof.").

When it comes to the strategic decisions a defense attorney makes at trial, the Supreme Court has been pellucid: "Courts must 'indulge the strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Chandler*, 218 F.3d at 1314 (quoting *Strickland*, 466 U.S. at 689–90). "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one we will seldom, if ever, second guess." *Waters*, 46 F.3d at 1512 (citing *Solomon v. Kemp*, 735 F.2d 395, 404 (11th Cir. 1984)). To rebut the strong presumption that counsel's strategic decision not to call a witness was reasonable, "a petitioner must establish that no competent counsel would have made such a choice." *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998). Even if counsel erred, the petitioner must *also* show that counsel's failure to call the witness prejudiced her defense. *See Fortenberry v. Haley*, 297

F.3d 1213, 1227 (11th Cir. 2002) ("Whether or not defense counsel's investigation [of an exculpatory witness] was in fact unreasonable under *Strickland*, we find that the testimony . . . is insufficient to undermine confidence in the conviction."). A petitioner is generally not prejudiced if there is already "strong evidence of [her] guilt" or if "the omitted evidence is aggravating, cumulative, or incompatible with the defense strategy." *Thomas v. United States*, 596 F. App'x 808, 811 (11th Cir. 2015) (citing *Rhode v. Hall*, 582 F.3d 1273, 1287 (11th Cir. 2009)).

The state postconviction court reasonably applied federal law when it concluded that (1) counsel didn't perform deficiently because Olivia Gonzalez wasn't available to testify, and (2) Cardona wasn't prejudiced by Gonzalez's unavailability because she elicited Gonzalez's exculpatory testimony through two *other* witnesses. We'll discuss each point in turn.

*First*, Olivia Gonzalez *was* "unavailable" to testify at Cardona's trial, and—even if she wasn't— Cardona waived her right to challenge the state court's finding about Gonzalez's availability. "[A] defendant cannot establish ineffective assistance of counsel based on counsel's failure to call a witness who is unavailable." *White v. State*, 964 So. 2d 1278, 1286 (Fla. 2007); *see also Williamson v. Moore*, 221 F.3d 1177, 1181 (11th Cir. 2000) ("Counsel cannot be said to be ineffective for failing to call an unavailable witness."). Under Florida law, a witness is "unavailable" in one of five (and only five) circumstances: (1) when the witness "is exempted by a ruling of a court on the ground of privilege from testifying"; (2) when the witness "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so"; (3) when the witness "has suffered a lack of memory of the subject matter of his or her statement"; (4) when the witness "is unable to be present or to testify at the hearing because of death or because of then-existing physical or mental illness or infirmity"; or (5) when the witness "is absent from the hearing, and the proponent of a statement has been unable to procure the declarant's attendance or testimony by process or other reasonable means." FLA. STAT. § 90.804(1)(a)–(e). The proponent of the witness's testimony "has the

burden of establishing unavailability and showing the exercise of due diligence in making a good-faith

effort to secure the declarant's attendance." *Miles v. State*, 324 So. 3d 1027, 1028 (Fla. 1st DCA 2021).

If a witness is deemed unavailable, the proponent can introduce (among other things) the unavailable

witness's "prior testimony," *Thompson v. State*, 995 So. 2d 532, 534 (Fla. 2d DCA 2008), or any prior

declaration that "qualifies as a 'statement against interest,'" *Reynolds v. State*, 934 So. 2d 1128, 1139 (Fla.

2006).

Gonzalez's unavailability was first discussed in open court on October 26, 2017. At that

hearing, both sides' lawyers explained that there were "alleged statements made by [Gonzalez] to

people she was in prison with [ ] from years ago"—specifically, an alleged confession that "she struck

[L.F.] with a baseball bat." 10/26/17 Hr'g Tr. [ECF No. 13-1] at 17, 19. This statement was important

to Cardona's defense because, during her original trial, Gonzalez had "testified that it was Ana

Cardona who was the one that struck the child over the head with a bat and essentially killed him."

11/16/17 Hr'g Tr. [ECF No. 13-2] at 12. Almost a month later, on November 16, 2017, the parties

returned to court to update the judge on Gonzalez's availability. At this second hearing, defense

counsel *asked* the court to find that Gonzalez was *unavailable* to testify. Here's what counsel said:

> [Defense Counsel:] Well, the issue of Olivia Gonzalez's availability, I think we should
> address that first. The State has tried to find her to serve her to at least give us an—
> she could [not] be served. They haven't been able to find her. The only address that
> we have for her was her parent's [sic] address. About a week or so ago, my investigator
> went out there, twice, eventually communicated with her father. The father said that
> she's moved, he doesn't know where she is. He doesn't know, he says that he thinks
> she worked for a pool company.
>
> Olivia, a couple weeks later, left a voicemail for my investigator saying, leaving me
> alone. Leave my family alone. I don't want to—to this case, et cetera. I believe she, I
> believe Ms. Gonzalez also expressed the same sentiment when she spoke with the
> prosecutors sometime before that.
>
> So this is the situation we're in. We believe that we have made, we're at a dead end as
> far as being able to find her. So we are asking the Court to determine that she's
> unavailable as a witness.

*Id.* at 10–11 (errors in original). Defense counsel then argued that, if the court found Gonzalez unavailable, it should also allow Cardona to introduce "the testimony of two former inmates who will testify as to admissions that [Gonzalez] made when she was incarcerated." *Id.* at 11.

The State *objected* to defense counsel's request. The prosecutor explained that "leaving a phone message saying that she has no desire to come in or to cooperate is vastly different from the Defense serving her with a subpoena and requiring her to show up." *Id.* at 13. The State also argued that the defense had failed to exercise due diligence because "they didn't start looking for [Gonzalez], by their own admission, until November 1st," and because the defense never sent its investigator to research Gonzalez's employment or to look her up on social media. *Id.* at 13–14. The defense lawyer replied that, despite Gonzalez's social-media presence, he was unable to find "an accurate address" where she could be subpoenaed. *Id.* at 14. At the end of this second hearing, the trial judge decided to issue a subpoena to compel Gonzalez's parents to answer questions, under oath, about "where [Gonzalez] is and where she can be served." *Id.* at 20.

The parties were back before the judge on this issue five days later (November 21, 2017). At this third hearing, the State reversed course and acknowledged that Gonzalez's parents "also do not know her address. They only have her phone number, the same number that [the parties already] have." 11/21/17 Hr'g Tr. [ECF No. 13-3] at 3. The State was thus prepared "to stipulate that Olivia Gonzalez is unavailable for purposes of trial." *Ibid.* The parties then told the judge that they had reached agreement on the Gonzalez issue: The State would concede that "Olivia Gonzalez is unavailable" to testify at trial, and in exchange the defense would not question Odalys Fernandez and Margarita Valero—the two inmates who allegedly heard Gonzalez's confession—about Gonzalez's apparent "propensity for violence in jail or anywhere else." *Id.* at 5–6.

The next day, Cardona appeared in court with her lawyers, where the following exchange occurred:

[Defense Counsel:] Just for the record, [co-counsel] Mr. Alvarez and I did meet with our client yesterday. We discussed that, among many other matters, and our client is absolutely in agreement with the stipulation that Ms. Gonzalez is unavailable.

The Court: All right. Ms. Cardona, you spoke to your lawyers yesterday about agreeing that Ms. Gonzalez is unavailable?

The Defendant: Yes, Your Honor.

The Court: And you are in agreement that they make that stipulation?

The Defendant: Yes, I agree with my lawyer.

11/22/17 Hr'g Tr. [ECF No. 13-4] at 3.

The state-court record here is thus clear: The State, defense counsel, *and Cardona* all agreed that Ms. Gonzalez was unavailable to testify. And they were right to say so. A witness who cannot be found will be considered unavailable *so long as* the parties "made a good-faith effort to obtain [her] presence at trial." *Barber v. Page*, 390 U.S. 719, 725 (1968); *accord McClain v. State*, 411 So. 2d 316, 317 n.3 (Fla. 3d DCA 1982) ("Even in instances where the witness cannot be found, before the witness will be declared unavailable, there must be a showing of a good faith effort to locate him."). No one, including Gonzalez's own parents, knew where Gonzalez was living. *See* 11/21/17 Hr'g Tr. [ECF No. 13-3] at 3 ("[Defense Counsel:] We have had discussions with the State. Our understanding is they have talked to the parents, the witnesses, who also do not know her address."); 11/16/17 Hr'g Tr. [ECF No. 13-2] at 15 ("[Defense Counsel:] [Y]eah, she has a social media presence. So does her girlfriend, but it doesn't give contact information."). And, although the parties had Gonzalez's phone number, Gonzalez told them in no uncertain terms that she didn't want to testify and that they should leave her alone. *See* 11/16/17 Hr'g Tr [ECF No. 13-2] at 10 ("Olivia, a couple weeks later, left a voicemail for my investigator saying, leav[e] me alone. Leave my family alone. I don't want to—to this case, et cetera."). Gonzalez was thus plainly unavailable under Florida law. *See, e.g., Foster v. State*, 614 So. 2d 455, 459 (Fla. 1992) ("We find no error in the trial court's determination that Rogers was unavailable. . . . [D]efense counsel gave the state attorney Rogers' address and telephone number in

26

Tampa. The state attorney called the number several times. . . . Rogers never returned the phone calls.
. . . A deputy attempting to serve the subpoena was advised by someone at Rogers' address that she
was out of town at an unknown location. This was sufficient to establish Rogers' unavailability for
purposes of the resentencing hearing."); *Essex v. State*, 958 So. 2d 431, 432 (Fla. 4th DCA 2007)
("Investigators from the state attorney's office unsuccessfully tried to locate B.D. The state attorney's
office also contacted the Arcadia Police Department, which was unable to find B.D. at either her old
or new address. The prosecutor informed the trial court that the state called all prior phone numbers
associated with B.D., without locating her.").

Unconvinced, Cardona insists that her trial attorneys could have done more to secure
Gonzalez's appearance at trial. She says that her lawyers could have "subpoena[ed] this witness for
trial." Petition at 9. Alternatively, she adds, defense counsel shouldn't have "waited until two weeks
prior to trial to attempt to contact Gonzalez." *Id.* at 11. Two problems with this. *One*, Cardona already
*agreed*, in open court, that Gonzalez was unavailable. *See* 11/22/17 Hr'g Tr. [ECF No. 13-4] at 3. She
can't now go back on her word to support a claim on collateral review. *See Blackledge v. Allison*, 431 U.S. 63,
73–74 (1977) ("[T]he sworn representations of the defendant . . . constitute a formidable barrier in
any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption
of verity."); *see also Forbes v. Sec'y, Dep't of Corr.*, 2022 WL 17082912, at *9 (S.D. Fla. Nov. 18, 2022)
(Altman, J.) ("In the world of habeas corpus, there are no take-backs."). This is particularly true in the
circumstances of our case where Cardona *stipulated* to Gonzalez's unavailability *precisely because* she
wanted to prevent Gonzalez from implicating her in L.F.'s murder. The State, remember, had called
Gonzalez at Cardona's first trial, where she had testified that Cardona murdered L.F. by striking him
in the head with a baseball bat. And the original jury had found Gonzalez credible and sentenced
Cardona to death. Cardona was thus unsurprisingly only too willing to have Cardona stay home for
round three.

*Two*—and in any case—neither of Cardona's proposed solutions would've helped the parties find Gonzalez. Gonzalez obviously couldn't be subpoenaed because no one knew where she was. *Cf. Thor v. United States*, 574 F.2d 215, 220 (5th Cir. 1978) ("But, where a witness cannot be located, there is no error in denying a subpoena."). And nothing about Gonzalez's blunt response to defense counsel—"leav[e] me alone. Leave my family alone."—suggests that, if only the parties had contacted her earlier, she would have been more amenable to testifying. *See* 11/16/17 Hr'g Tr [ECF No. 13-2] at 10.[7] Long story short, the state court reasonably concluded that "Cardona's counsel could not be deficient for not securing a witness that was unavailable[.]" Order Denying Postconviction Motion [ECF No. 16-16] at 48–49.

*Second*, Cardona wasn't prejudiced by Gonzalez's unavailability because the jury heard all about Gonzalez's supposed confession from two other witnesses. Cardona concedes that her *only reason* for wanting Gonzalez to testify was to have her confess that *she* was the one who hit L.F. with a bat. *See* Petition at 10 ("Olivia Gonzalez openly admitted to using a baseball bat to strike the victim. The testimony would have been beneficial evidence to the defendant and would have caused a different outcome in the verdict."); Reply at 14 ("Gonzalez's testimony was needed at the Petitioners [sic] trial to show that she did admit to striking the victim in the head[.]"). But Mesdames Fernandez and Valero *both* testified that they heard Gonzalez say precisely that in jail. *See* Trial Tr. Vol. 12 [ECF No. 14-12] at 145 ("[Fernandez:] Maritza called [Gonzalez] baby-killer and Olivia say yes, if the bat—if I hit the baby and—if I hit the baby and the bat, it was one kill it, then I killed the baby and I'll kill yours." (errors in original)); *id.* at 162 ("[Valero:] The girls in front of me were talking about the lollipop case. And Olivia passed by and she went off. And she said, yeah, yeah, I went to hit him with a bat, so what,

---

[7] Plus, Cardona's argument that Gonzalez would've been more compliant a few weeks (or months) earlier is pure speculation. *See Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985) ("Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.").

so what."); *id.* at 163 ("[Valero:] I hear [Gonzalez] saying that she didn't care, she was the one that hit the girl—the boy with the bat. And she just didn't care."). We thus agree with the state postconviction court that Cardona *couldn't* have been prejudiced by Gonzalez's unavailability because she got the evidence she wanted in anyway. *See Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1296 (11th Cir. 2012) ("[I]t is reasonable for a state court to conclude that a petitioner suffers no prejudice when the [new] evidence is either weak or cumulative of the testimony presented at trial.").

In her Reply, Cardona contends that, "[e]ven if Gonzalez changed her story at trial, she could and would have been impeached with her prior statements." Reply at 14. Three problems with this. *One*, Gonzalez was *never* going to confess to killing L.F. On the contrary, *even* back in state court— while the parties were fighting about Gonzalez's appearance—Cardona's lawyers admitted that they only wanted to call Gonzalez so that they could lay the predicate for Fernandez's and Valero's testimony. *See* 11/16/17 Hr'g Tr. [ECF No. 13-2] at 11 ("[Defense Counsel:] [W]e would be willing to call [Gonzalez] in order to lay a predicate for the introduction of the testimony of two former inmates who will testify as to admissions that she made when she was incarcerated."). Since Fernandez and Valero ended up testifying anyway, Cardona got to have her cake and eat it too. She, in other words, was allowed to elicit the supposed confession she wanted from Fernandez and Valero *without* having to endure the wrath of Gonzalez's (very) inculpatory testimony. *Cf. Cardona I*, 641 So. 2d at 362 ("Cardona grabbed the bat from Gonzalez-Mendoza. Gonzalez-Mendoza then left the room. When she returned, Cardona told her that Cardona believed she had killed [L.F.].").[8]

---

[8] This back-and-forth with Gonzalez is nothing new. In Cardona's *original trial*, Cardona's lawyer got Gonzalez to admit that she had told the police *she*, not Cardona, had hit L.F. with a bat. *See* Olivia Gonzalez Testimony [ECF No. 16-8] at 228 ("Q: And during your interview with Brian Slattery on December 27th, you told Mr. Slattery that you hit [L.F.] in the head with a bat; correct? A: Yes, I told him."). Despite this impeachment, Gonzalez continued to insist that she *never* hit L.F. over the head with a baseball bat. *See id.* at 229 ("I didn't do that to the boy. . . . I did not hit him on the head like you said."). Anyway, as we've established, the jury didn't find this line of questioning in the least bit persuasive since they found Cardona guilty and sentenced her to death.

*Two*, as the Respondent notes, Florida law forbids a party from calling a witness *solely* to impeach that witness with a prior inconsistent statement. *See Bateson v. State*, 761 So. 2d 1165, 1169 (Fla. 4th DCA 2000) ("[If a party] calls the witness for the sole purpose of impeaching him with his prior statement, the practice may be considered abusive because 'there is no legitimate forensic purpose in calling a witness solely to impeach him.'" (quoting *Morton v. State*, 689 So. 2d 259, 263 (Fla. 1997), *overruled on other grounds by Rodriguez v. State*, 752 So. 2d 29 (Fla. 2000))). And that's exactly what Cardona says she wanted her lawyer to do here—impeach Gonzalez's testimony ("Cardona hit L.F. with a baseball bat") with her prior inconsistent statement ("I hit L.F. with a baseball bat"). *See* Reply at 14 ("Gonzalez's testimony was needed at the Petitioners [sic] trial to show that she did admit to striking the victim in the head . . . . Even if Gonzalez changed her story at trial, she could and would have been impeached with her prior statements."). Under Florida law, she wouldn't have been allowed to do that.

*Three*, far from exonerating Cardona, Gonzalez's statements would have contradicted Cardona's defense—which, recall, was that she *couldn't* have killed L.F. because he *wasn't* in her custody when he died. *See* Trial Tr. Vol. 14 [ECF No. 14-14] at 10–11 ("[Defense Counsel:] Wherever [L.F.] was for those last couple months, Ana wasn't there."). If Gonzalez had testified, she would have told the jury (as she had in the first trial) that she, Cardona, and L.F. were *all living together*—thus undermining Cardona's central defense. *See Cardona I*, 641 So. 2d at 362 ("Cardona and her children lived with Gonzalez-Mendoza in a series of cheap hotels."); *see generally* Olivia Gonzalez Testimony [ECF No. 16-8] at 20–171 (describing how she and Cardona had been living *together* and how the two of them had repeatedly abused L.F. *together*). By calling Gonzalez, in other words, Cardona would have bolstered the State's theory—which was that Cardona and Gonzalez had *both* engaged in the "extensive abuse" of L.F. Response at 97. And this would have been extremely problematic for Cardona because, as the Respondent notes, "both Cardona and Gonzalez were charged as principals,

which made each responsible for the acts of the other." *Ibid.*; *see also, e.g.*, *Zile v. State*, 710 So. 2d 729, 737 (Fla. 4th DCA 1998) (affirming the defendant's conviction for aggravated child abuse and felony murder where she stood "by and [allowed] [the codefendant] to punish the victim so severely. . . . [T]he evidence suggested that Appellant approved and condoned the attack . . . and willfully intended the beating or torture to continue."); *Beachy v. State*, 837 So. 2d 1152, 1152 (Fla. 1st DCA 2003) ("As a general rule, the felony murder rule and the law of principals combine to make a felon liable for the acts of a co-felon." (citing *Bryant v. State*, 412 So. 2d 347, 350 (Fla. 1982))).

Because the state court's decision to deny these claims was reasonable, we now likewise **DENY** Grounds Two and Three on the merits.

### C.   Ground Four

In Ground Four, Cardona claims that defense counsel was ineffective by failing to move for a change of venue under FLA. R. CRIM. P. 3.240, even though she had told counsel that "she felt that she would not receive a fair trial in Dade County, Florida." Petition at 14. According to Cardona, the "magnitude of the impact" the local media attention had on her case "is so prejudicial that it was clearly unfair to have the trial in the same community that twice before developed a pre disposition toward the petitioner and the facts of the case." *Id.* at 15 (errors in original). The Respondent unsurprisingly points out that "the trial court carefully conducted voir dire to determine which jurors had prior of knowledge of the case" and argues that any potential prejudice was minimized because "the offenses occurred 25 years prior to the time of the trial[.]" Response at 102–03.

As with Grounds Two and Three, we'll review the reasonableness of the state postconviction court's Order Denying Postconviction Motion because it's the "last related state-court decision that does provide a relevant rationale." *Wilson*, 138 S. Ct. at 1192. The state postconviction court found that, under state law, a change of venue is appropriate *only* if "the inhabitants of a community are so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions

that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom." Order Denying Postconviction Motion [ECF No. 16-16] at 49 (quoting *Griffin v. State*, 866 So. 2d 1, 12 (Fla. 2003)). And, "[b]ased on the voir dire in Cardona's case," the postconviction court concluded that a motion to change venue wouldn't have been successful because there was "no difficulty sitting a jury in [this] case." *Ibid.*

The Sixth and Fourteenth Amendments to the U.S. Constitution protect a defendant's right "to be tried by a panel of impartial, indifferent jurors." *Coleman v. Kemp*, 778 F.2d 1487, 1489 (11th Cir. 1985). Although this right is violated where the trial court cannot "seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere," a defendant is *not* "entitled to a change of venue whenever potential jurors have been exposed to the facts of the case." *Meeks v. Moore*, 216 F.3d 951, 960 (11th Cir. 2000) (quoting *Coleman*, 778 F.2d at 1489). To show that counsel was ineffective by failing to move for a change of venue, the petitioner must "bring forth evidence demonstrating that there was a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue if [counsel] had presented such a motion to the court." *Id.* at 961. Faced with a motion to change venue, a Florida court engages in a "two-pronged analysis": *first*, the court must evaluate "the extent and nature of any pretrial publicity"; *second*, it must determine "whether any difficulty encountered in selecting the jury reflected a pervasive community bias against the defendant which so infected the jury selection process that it was impossible to seat an impartial jury." *Ellerbee v. State*, 232 So. 3d 909, 919 (Fla. 2017) (cleaned up).

Cardona's trial was widely publicized in South Florida. Still, the state postconviction court found that any motion to change venue would have been denied because the trial court "had no difficulty sitting a jury in [this] case." Order Denying Postconviction Motion [ECF No. 16-16] at 49. This was *both* a reasonable application of federal law *and* a reasonable determination of the facts. We recognize at the outset that picking a jury in this case would have been difficult *anywhere*. As the trial

court explained, any juror would have "to view graphic autopsy and crime scene pictures and . . . hear testimony about these pictures" *and then* remain impartial despite knowing that "the victim in this case was a three-year-old child who suffered serious injuries." Trial Tr. Vol. 1 [ECF No. 14-1] at 11–12.

Given the obvious difficulties involved in picking a jury in a case like this, the trial court devised the following *voir dire* strategy, which he explained to the original group of fifty venire members:

> So we're going to do this in phases. There's essentially going to be three parts to this jury selection. I'm going to talk to you all right now, and after I'm done talking to all of you, there will be a number of you that I will need to speak to individually, and I will do that.
>
> A lot of you will be released after this first process. It's going to almost be like Survivor where people get voted off the island. We'll be voting a lot of you off the island. Then I'm going to this afternoon speak to another 50 jurors. Tomorrow morning I'll speak to another 50 jurors. At some point when I have enough jurors, I'm going to merge all the tribes. And then I will, again, speak to all of you and explain the law to you and find out if you can follow the law.
>
> After I'm done, then the lawyers will ask you questions. When they are done, then we will pick a jury. The end goal is to pick 16 people to serve on this jury.

*Id.* at 17–18. For each group of fifty venire members, the trial judge asked several basic questions—all related to their fitness to serve on the jury. *Id.* at 28–29. We'll focus our attention on the three "big" questions the judge asked every juror: Can you sit for a two-week trial? Do you "have any knowledge of this case?" And would you be unable "to view graphic autopsy and crime scene pictures . . . [of] a three-year old child who suffered serious injuries?" *Id.* at 28–29, 55, 57. The trial court ultimately went through four groups of fifty prospective jurors each. Of these two-hundred venire members, sixty-five survived to the next phase. *See* Trial Tr. Vol. 3 [ECF No. 14-3] at 162 ("I have about 65 of you left.").

This process, on top of being well-thought out and efficient, confirms what the state postconviction court already found—which is that Cardona's *voire dire*, which took place decades *after* L.F.'s murder, wasn't all that affected by the media attention. A significant *majority* of the venire had

*no* memory of Cardona's case, and many of the prosecutive jurors who *were* stricken for cause were excused for reasons having *nothing* to do with the case's publicity—things like medical appointments and ailments, an inability to serve for two weeks, or a refusal to look at gruesome autopsy photos of a small child. *See generally* Trial Tr. Vol. 1 [ECF No. 14-1] at 28–118, 143–97; Trial Tr. Vol. 2 [ECF No. 14-2] at 1–27, 55–171; Trial Tr. Vol. 3 [ECF No. 14-3] at 1–127. Indeed, only a small minority of venire members told the court that they had ever even heard about Cardona's case:

- In the first venire panel, only eight of the fifty prosecutive jurors remembered the case: Mr. Ritter, Ms. Castillo, Mr. Dixon, Ms. Marengo, Ms. Arguello, Ms. Mazuelos, and Ms. Maytin-Miret. *See* Trial Tr. Vol. 1 [ECF No. 14-1] at 56–57.

- In the second venire panel, again, only eight of the fifty prospective jurors remembered the case: Ms. Hunt, Ms. Mendoza, Mr. Brown, Mr. Coogan, Ms. Limatuj, Ms. Rodriguez, Ms. Padilla, and Ms. Goodale-Yerian. *See id.* at 169–70.

- In the third panel, fifteen of the fifty venire members had heard of Cardona's case: Ms. Cabello, Ms. Morales, Ms. Nickas, Ms. Eberhardt, Ms. Isaacs, Mr. Garcia, Ms. Anglade, Ms. Sakowicz, Mr. Campos, Ms. Martinez, Ms. Duncan, Ms. Furniss, Ms. Seff, Ms. Stanley, and Mr. Alter. *See* Trial Tr. Vol. 2 [ECF No. 14-2] at 86–88.

- In the fourth panel, ten of the fifty venire members had heard of the case: Ms. Hepburn, Ms. Berzofsky, Mr. Rodriguez, Ms. Hernandez, Ms. Dobbins, Ms. Blackmore, Mr. Rauseo, Ms. Cruz, Mr. Castellanos, and Ms. Feenane. *See* Trial Tr. Vol. 3 [ECF No. 14-3] at 19–20.

All told, only forty-one of two-hundred prospective jurors (less than twenty-five percent) knew about Cardona's case. This fact alone probably shows that a venue motion would have been denied. *Cf. Ellerbee*, 232 So. 3d at 921 ("Roughly 32% of the veniremembers indicated they either had been previously exposed to the facts of the case or knew someone involved in the trial. . . . [T]his fact alone is not sufficient to warrant a change of venue."); *see also Murphy v. Florida*, 471 U.S. 794, 803 (1975) ("In the present case, by contrast, 20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt. This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against

petitioner as to impeach the indifference of jurors who displayed no animus of their own." (footnote omitted)).

In any event, even if more venire members had known about Cardona's case, her venue motion would still have been denied. The Florida Supreme Court, after all, has repeatedly held that, to prevail on a venue motion because of pretrial publicity, a criminal defendant must demonstrate a "pervasive community bias" against him. *See, e.g.*, *State v. Knight*, 866 So. 2d 1195, 1209 (Fla. 2003) ("Although there may have been some publicity surrounding the murder of Officer Burke, an independent review of the record demonstrates that there was no difficulty in seating the jury."); *Armstrong v. State*, 862 So. 2d 705, 719 (Fla. 2003) ("Furthermore, the mere fact that jurors were exposed to pretrial publicity is not enough to raise the presumption of unfairness."); *see also Bundy v. Dugger*, 850 F.2d 1402, 1425 (11th Cir. 1988) ("[P]rejudice is not presumed simply because the defendant's criminal record is well publicized."). And Cardona has failed to show any community bias—let alone "pervasive community bias"—here. On the contrary, the trial court took only *three days* to pick a jury from a venire pool that, for the most part, had no idea who she was. In these circumstances, the state trial court would have denied a venue motion because "the record reflects that [Cardona] was able to select a fair and impartial jury[.]" *Gonzalez v. State*, 253 So. 3d 526, 530 (Fla. 2018).

Because a motion to change venue would've been futile, the state postconviction court reasonably concluded that counsel wasn't ineffective for failing to file it. *See Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) ("Accordingly, Chandler's [counsel] was not ineffective for failing to raise a nonmeritorious issue."). We therefore **DENY** Ground Four.

### D.    Ground Five

In her final ground for relief, Cardona argues that counsel was ineffective for failing to strike "five potential jurors [who] had admitted that they had previously heard about the case[.]" Petition at

17. Although Cardona doesn't name these jurors in the Petition, her state Postconviction Motion did. *See* Postconviction Motion [ECF No. 16-16] at 9–14 (identifying these jurors as Stanley, Capello, Castillo, Limatuj, and Sandoval). The state postconviction court disposed of this claim in two steps. *First*, it found that Cardona's "claims as to Jurors Capello and Limatuj lack any merit because both jurors were excused before deliberations commenced." Order Denying Postconviction Motion [ECF No. 16-16] at 51. *Second*, it concluded that Cardona's claims against the other three jurors were "pure speculation" since there was no evidence that they harbored *any* bias against her. *Id.* at 50.

"A criminal defendant has the right to an impartial jury, and a prospective juror who lacks impartiality must be excused for cause." *Fennell v. Sec'y, Fla. Dep't of Corr.*, 582 F. App'x 828, 832 (11th Cir. 2014) (citing *Ross v. Oklahoma*, 487 U.S. 81, 85–86 (1988)). The Florida Supreme Court has explained that, "where a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was *actually biased.*" *Carratelli v. State*, 961 So. 2d 312, 324 (Fla. 2007) (emphasis added). "Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial—*i.e.*, that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record." *Ibid.*; *see also United States v. Chandler*, 996 F.2d 1073, 1102 (11th Cir. 1993) ("A party challenging a juror for cause must demonstrate that the juror in question exhibited actual bias by showing either an express admission of bias or facts demonstrating such a close connection to the present case that bias must be presumed."). Under this "actual bias" standard, a criminal defendant must "establish that a particular juror could not be fair and impartial and follow the law as instructed by the trial court[.]" *Boyd v. State*, 200 So. 3d 685, 696 (Fla. 2015); *cf. Sinclair v. Sec'y, Fla. Dep't of Corr.*, 2022 WL 16700291, at *8 (S.D. Fla. Nov. 3, 2022) (Ruiz, J.) (finding that the petitioner failed to prove "actual bias" where the prospective juror said that she "would follow the trial court's instructions, hold the State to its substantial burden of proof, and respect Petitioner's right to remain silent at trial").

The state postconviction court reasonably concluded that *none* of the five jurors Cardona identified in her Postconviction Motion harbored any bias (let alone "actual bias") against her. Before we explain why we think so, we'd like to briefly touch on the state postconviction court's finding that "Cardona's claims as to Jurors Capello and Limatuj lack any merit because both jurors were excused before deliberations commenced." Order Denying Postconviction Motion [ECF No. 16-16] at 51. Although we agree with this conclusion—mainly because it makes a lot of sense—we'd be remiss if we didn't point out that at least one federal judge has disagreed. *See Nichols v. Thomas*, 788 F. Supp. 570, 572 (N.D. Ga. 1992) (Moye, J.) ("Finally, the fact that Mr. Keys was replaced by an alternate juror after only three state witnesses had testified does not cure the possibility, perhaps even remote, of a taint already created in the jury panel."). As we've indicated, however, we agree with the majority view, which is that a defendant cannot be prejudiced by a juror who didn't participate in the verdict. *See, e.g., Mesa v. Sec'y, Dep't of Corr.*, 2011 WL 611665, at *6 (M.D. Fla. Feb. 11, 2011) (Merryday, J.) ("Although he served on the jury, Blackford was the alternate juror and did not deliberate Mesa's guilt or innocence."); *United States v. Williams*, 1999 WL 1021442, at *2 (E.D. La. Nov. 8, 1999) (Clement, J.) ("Because the alternate jurors, of which petitioner complains, were excused prior to deliberations, petitioner cannot show that defense counsel's failure to strike was prejudicial to his case."); *cf. United States v. Acevedo*, 141 F.3d 1421, 1424 (11th Cir. 1998) (holding, in the context of a Fed. R. Crim. P. 24(c) violation, that a defendant isn't prejudiced unless "[an alternate juror] caused the twelve regular jurors who rendered the final verdict to convict instead of acquit"). In any event—and in the interest of completeness—we'll explain why we think the state court got it right when it said Cardona had failed to show that *any* of the five challenged jurors were "actually biased" against her.

Cardona insists that the five jurors shouldn't have been seated because each "had admitted that they had previously heard about the case from the original onset of the crime." Petition at 17.

This is only partially true: In fact, only three of the five jurors admitted to having any recollection about the case. *See, e.g.*, Trial Tr. Vol. 1 [ECF No. 14-1] at 84 ("[Juror Castillo]: I just remember about the little kid and baby named Lollipop, but I don't really remember the details. The Court: Okay. Do you remember why the child was nicknamed Lollipops? Castillo: No."); Trial Tr. Vol. 2 [ECF No. 14-2] at 4–5 ("[Juror Limatuj:] The only thing I remember is hearing about it because it was so long ago, and I was a teenager, so I was busy in my own little world. But I[ ] never really saw anything or sat and saw the news or anything like that, so I don't really remember anything, actually remember hearing about it."); *id.* at 155–56 ("[Juror Stanley]: About the lollipop kid, and I had been hearing that for about the last two or three years. . . . [I only remember that] they found the baby, you know, about three or four days later, the body was semi-decomposed."). The other two jurors—Cappello and Sandoval—didn't remember the case, though they worked in places that *might* be perceived as having *some* (very) tangential relationship to the *kind* of case we're dealing with. Juror Cappello worked at the "Turner Guilford Night Center," a Miami-Dade County jail Cardona had spent some time in, but she didn't know Cardona (or her case) at all. *See id.* at 127 ("The Court: Take a good look at [Cardona], and let me know if—if you think you've seen her before. [Juror Cappello]: I don't think so. That's why I didn't say anything in the beginning. I don't think so."). And Juror Sandoval was a pediatric nurse who treated abused children. *See* Trial Tr. Vol. 5 [ECF No. 14-5] at 165 ("[Defense Counsel]: Okay. Have you ever had to care or treat a child who was abused, physically abused? [Juror Sandoval]: Yes."). But she likewise didn't remember Cardona or her case. *See* Trial Tr. Vol. 1 [ECF No. 14-1] at 169–70 (indicating that Juror Sandoval didn't raise her hand when the venire was asked: "Does anyone know anything about this case? Ever heard about it in any way?").

As for Jurors Castillo, Limatuj, and Stanley, they were clear that they weren't biased against Cardona at all—even if they did have some very distant recollections about the case. For example, Juror Castillo testified that she "just remember [sic] about the little kid and baby nicknamed

Lollipop[.]" Trial Tr. Vol. 1 [ECF No. 14-1] at 84. Juror Limatuj said that "the only thing she remembered" was "[t]he name Baby Lollipop." Trial Tr. Vol. 2 [ECF No. 14-2] at 5. And Juror Stanley only remembered two things: the name "Baby Lollipops" and the fact that "they found the baby, you know, about three or four days later, the body was semi-decomposed." *Id.* at 155–56. *None* of these jurors could recall *anything else* about the case—let alone Cardona's involvement in it. Most importantly, the trial court asked all three jurors whether they would "be able to set aside what it is you think you remember you heard many years ago or even recently and rely only on the evidence you hear in this courtroom," and all three, under oath, answered "yes." *See* Trial Tr. Vol. 1 [ECF No. 14-1] at 84–85; Trial Tr. Vol. 2 [ECF No. 14-2] at 5; Trial Tr. Vol. 2 [ECF No. 14-2] at 156.

The Florida Supreme Court has repeatedly cautioned trial courts *not* to infer that a juror is biased merely because that juror heard about the case before *voir dire. See Boyd v. State*, 324 So. 3d 908, 918 (Fla. 2021) (holding that a juror harbored no actual bias against the defendant even though "she had some level of preconceived notion about the case, but not a clear prejudgment of Boyd's guilt"); *Johnson v. State*, 63 So. 3d 730, 744 (Fla. 2011) (agreeing that two jurors who "indicated that they had heard about the case on the news" were not actually biased against the defendant because the jurors "indicated that [they] retained the ability to be impartial"). And the Eleventh Circuit has likewise required a criminal defendant to show that a juror harbored some "preconceived notion as to guilt or innocence of [the] accused[.]" *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1356 (11th Cir. 2020) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)). Cardona hasn't come close to meeting this standard here.

Nor can we impute actual bias to Jurors Cappello and Sandoval. Cardona believes that these two jurors "gave answers that demonstrated that they were biased and could not fairly evaluate the evidence without bias." Reply at 16. That's just not true. Both jurors, in fact, confirmed that they could be fair and impartial and that their occupations would have *no effect* on their deliberations. *See* Trial Tr.

Vol. 2 [ECF No. 14-2] at 127–28 ("The Court: Is there anything about this—anything about your job that would keep you from being fair in this case to both sides? Juror Cappello: Everybody's due a due process. The Court: Okay. And you don't know anything about this case other than what I told you? Juror Cappello: No."); Trial Tr. Vol. 5 [ECF No. 14-5] at 165 ("[Defense Counsel:] Do you think there is anything from that experience—hearing and listening to a case in which the charges are aggravated child abuse and first-degree murder—is there anything from your experience that might affect your ability to be fair and impartial in this case? Juror Sandoval: Absolutely not. Every situation is different. Every story is different. I'll treat them as their own."). As with Jurors Castillo, Liamtuj, and Stanley, then, Cardona hasn't shown that either Juror Cappello or Juror Sandoval made an "express admission of bias" or had "such a close connection to the present case that bias must be presumed." *Chandler*, 996 F.2d at 1102.

The state court thus reasonably concluded that none of these five jurors were "actually biased" against Cardona. *See Johnson*, 63 So. 3d at 744 ("[T]he defendant failed to demonstrate actual bias where the challenged juror represented during voir dire that he could be fair, listen to the evidence, and follow the law." (citing *Carratelli*, 961 So. 2d at 327)); *see also United States v. Rhodes*, 177 F.3d 963, 965 (11th Cir. 1999) ("When the juror demonstrates, however, that she can lay aside any opinion she might hold and render a judgment based solely on the evidence presented in court, then dismissal is not required."). We therefore **DENY** Ground Five.

### EVIDENTIARY HEARING

We won't hold an evidentiary hearing in this case. "[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). Based on everything we've said in this Order—including and especially our meticulous references to a robust trial and state-postconviction record—we don't think we'd benefit from any

further factual development in this case.

CERTIFICATE OF APPEALABILITY

A Certificate of Appealability ("COA") is appropriate only when the movant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To deserve a COA, therefore, the movant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a district court has disposed of claims . . . on procedural grounds, a COA will be granted only if the court concludes that 'jurists of reason' would find it debatable both 'whether the petition states a valid claim of the denial of a constitutional right' and 'whether the district court was correct in its procedural ruling.'" *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001) (quoting *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000)). Since reasonable jurists would neither debate our procedural ruling on Ground One nor dispute our denial of the remaining claims on the merits, we **DENY** any request for a COA.

* * *

Having carefully reviewed the record and the governing law, we hereby **ORDER AND ADJUDGE** that the Petition [ECF No. 1] is **DISMISSED in part** and **DENIED in part** as set forth in this Order, that a COA is **DENIED**, that any request for an evidentiary hearing is **DENIED**, that all deadlines are **TERMINATED**, and that any pending motions are **DENIED** as moot. The Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida on June 27, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     Ana Cardona, *pro se*
        counsel of record